FILED

2020 Jun-24  PM 03:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **BRYAN HUGHES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:19-cv-01481** |
| | ) | |
| **LAMAR ADVERTISING CO.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case presents a disagreement over basic contract principles. The Plaintiff, a former

at-will-employee and salesman for a large advertising company, sued on behalf of himself and an

alleged nationwide class to challenge the company's unwritten but acknowledged policy of not

paying sales personnel commissions when clients paid the company more than 90 days late. The

parties agree on most relevant facts, but they disagree on the relationship between the company's

unwritten policy and the parties' existing, written contract. The Defendant argues that the

unwritten policy was part of the contractual agreement between the parties; the Plaintiff contends

that the policy unjustly gave grounds for the company to repeatedly breach the written contract

between the company and himself, as well as the contracts between the company and a putative

nationwide class of the company's sales personnel.

This case comes now before the court on the Defendant company's "Motion for

Summary Judgment or, Alternatively, Motion to Strike Class Allegations." (Doc. 8.) The court

finds that because the Plaintiff knew about the company's policy and continued to work for the

company, the policy became part of the agreement between himself and the company. For this

1

reason, the court WILL GRANT the Defendant's motion for summary judgment and MOOT the Plaintiff's class-certification attempt.

**Background**

Defendant Lamar Advertising Company, which owns and leases more than 360,000 billboards and other advertising displays, operates through hundreds of local offices, called "plants," throughout North America. According to the Complaint, each plant employs sales personnel called "account executives" who lease Lamar's space to advertisers and receive a salary plus a percentage of the funds the advertiser pays Lamar. (Doc. 1 at 3.) The general manager of each plant develops budgets and compensation plans for the account executives working through his or her plant. (Doc. 8-1 at 3.)

Plaintiff Mr. Hughes worked as an account executive in Lamar's Birmingham, Alabama plant between June 2010 and June 2017.[1] In July of 2010, the parties entered into a written agreement specifying that Mr. Hughes would receive a four percent commission on the net collected payments for the advertising space he sold, payable to Mr. Hughes when the advertiser clients payed Lamar. (Doc. 1 at 4.)

Mr. Hughes contends that Lamar had a nationwide policy of not paying commissions to account executives when clients paid Lamar more than 90 days (or 120 days, at one point) after

---

[1] According to the Complaint, Mr. Hughes "was employed by Lamar as an Account Executive and worked as an Account Executive for Lamar from approximately June of 2010 until June of 2017." (Doc. 1 at 3.) Mr. Hughes later testified, however, that he "was employed by [Lamar] from approximately June, 2002, until June of 2017." (Doc. 15-1 at 3.) Mr. Hughes further testified that "my agreement was not expressed in writing, originally, but I signed a document labeled 'Lamar Compensation Plan'" in July 2010. *Id.* Based on this evidence, the court is unsure what job Mr. Hughes performed for Lamar pursuant to an unwritten contract between 2002 and 2010—whether as an account executive or in some other capacity. Regardless, the parties seem to agree that the first *written* instrument between the parties appeared in July of 2010.

2

receiving invoices. Mr. Hughes alleges that between 2013 and 2017, clients would often pay off

their delinquent accounts more than 90 days late. On these occasions, Lamar received its proper

payment, but Mr. Hughes got nothing. Mr. Hughes contends that this policy ("the practice") does

not appear in any written contract between himself and Lamar, and that neither he nor members

of the putative class consented to the practice.

Based on these facts, Mr. Hughes brings two claims to recover his lost commissions

between 2013 and 2017. Count I, breach of contract, alleges that Mr. Hughes and the putative

class "had an expressed oral contract[2] that they would be paid a commission on rental fees . . .

[and] the agreement did not include any terms by regarding prompt payment by the customer.

The agreement was simply that they would be paid an agreed upon amount. Lamar breached this

agreement by not paying the agreed upon commission." (Doc. 1 at 8–9.) Mr. Hughes brings

Count II, unjust enrichment, as an alternative claim "in the case that the parties' differing

understandings as to the commission, or to the amount thereof[,] is so essential to the contract

that there was no meeting of the minds." (*Id.* at 9)

Pursuant to Federal Rules of Civil Procedure 23(b)(1)–(3), Mr. Hughes brings both

claims on behalf of himself and a class defined as follows:

> All persons who worked as Account Executives in the United States at Lamar from
> the beginning of the statutory period to the present who sold advertising space, but
> were not paid commissions due to the advertising customer not paying its bill until
> after ninety (90) days or 120 days depending upon the threshold established by
> Lamar at the time.

*Id.* at 6.

Mr. Hughes filed the Complaint on September 5, 2019. (Doc. 1.) Moving rapidly, Lamar

---

[2] Based on Mr. Hughes's subsequent arguments, the court assumes he meant to say, "express *written* contract."

3

filed an answer on November 11 (Doc. 5), the instant pre-discovery motion for summary judgment and to strike class allegations on November 18 (Doc. 8), and a motion to stay discovery on November 25. (Doc. 11.) The parties quickly filed briefs regarding the instant motion (Docs. 15, 19) as well as a flurry of discovery-related filings (Docs. 12, 13, 14). The court held a status conference regarding discovery on January 9, 2020 and issued an order permitting discovery only on the narrow matter of Mr. Hughes's monthly commission reports—known as "recap sheets"—during his tenure with Lamar. (Doc. 24.) Following limited discovery, Mr. Hughes submitted an additional brief opposing Lamar's motion to strike class allegations and for summary judgment. (Doc. 25.)

Lamar's motion presents two primary arguments. To support summary judgment, Lamar argues that Mr. Hughes was an at-will employee who was aware of the practice, so because he continued working for Lamar, he impliedly agreed to the practice and cannot succeed on either his breach-of-contract or unjust enrichment claim. Second, Lamar argues that class certification is inappropriate because for each alleged class member,

> a mini-trial would be required as to whether (1) "this practice" was used for him (or her), (2) he orally agreed to "this practice," (3) he was an at will employee who impliedly agreed to "this practice," (4) he had signed a written compensation plan including "this practice," (5) his subjective understanding as to whether and how "this practice" applied to him, (6) he had a severance agreement that would release any claim based on "this practice," and (7) the amount of commissions he was not paid based on "this practice."

(Doc. 9 at 5.) Lamar argues that all these individualized issues predominate over common questions, which prevents class certification under Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3). Because, as explained below, entry of summary summary judgment is proper, the court need not address Lamar's class-certification argument.

**Standard**

Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In response, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial*.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added).

The court must "view the evidence presented through the prism of the substantive evidentiary burden" to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party to defeat the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of

5

the jury. *Id.* at 255.

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins.*, 193 F.3d 1274, 1282 (11th Cir. 1999). After both parties have addressed the motion for summary judgment, the court must grant the motion only if no genuine issues of material fact exist and if the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

**Analysis**

In Alabama, a valid contract must include (1) an agreement, (2) consideration, (3) two or more contracting parties, (4) legal object, and (5) capacity. *Freeman v. First State Bank of Albertville*, 401 So. 2d 11, 13 (Ala. 1981). A plaintiff who brings a breach of contract claim must prove "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *S. Med. Health Sys. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995).

In this case, the central issue before the court is determining whether the practice constituted nonperformance by Lamar, as Mr. Hughes argues, or was a part of the parties' employment contract, as Lamar contends.

"[W]hether parties have entered a contract is determined by reference to the reasonable meaning of the parties' external and objective actions." *SGB Constr. Servs., Inc. v. Ray Sumlin Constr. Co.*, 644 So. 2d 892, 895 (Ala. 1994). *See also Deeco, Inc. v. 3-M Co.*, 435 So. 2d 1260, 1262 (Ala. 1983) ("The existence *vel non* of a contract is determined by reference to the reasonable meaning of the parties' external and objective manifestations of mutual assent.") Except as provided by statute, the elements of oral and written contract-formation are the same,

6

and a "contract may consist of several communications between the parties, some in writing and some oral, each constituting a link in the chain which comprises the entire contract.") *Lawler Mobile Homes, Inc. v. Tarver*, 492 So. 2d 297, 304 (Ala. 1986). And an at-will employment contract, whether written or oral, is terminable by either the employee or the employer for any cause or no cause at all. *Hickenbottom v. Preferred Risk Mut. Ins. Co.*, 514 So. 2d 881, 882 (Ala. 1987).

Here, the parties agree that Mr. Hughes was an at-will employee (Doc. 9 at 8–9.) The parties also appear to agree that Mr. Hughes was aware of the practice by January of 2013 at the latest, as Mr. Hughes's partially hand-written recap sheets from January and February 2013 show that he apparently calculated his commission earnings with the practice in mind when he deducted delinquent accounts from his reports. (Doc. 8-1 at 39, 40, 52, 53.)[3] Based on these two facts—Mr. Hughes's at-will status and awareness of the practice—Lamar concludes that Mr. Hughes accepted the practice as a term of his employment and cannot succeed on either his breach-of-contract or unjust enrichment claims.

Lamar cites to three cases to support this legal conclusion. First, Lamar quotes *Stutts v. Sears, Roebuck & Co.*, 855 F. Supp. 1574, 1584 (N.D. Ala. 1994) for the proposition that in Alabama, "The right to terminate an employee whenever the employer chooses necessarily includes the right to change the conditions of employment, including salary." *Id.*

Second, Lamar cites to Alabama Supreme Court opinion *Hoffman-La Roche, Inc. v. Campbell*, which held that

---

[3] Although the parties do not discuss previous recap sheets in this context, the February 2012 recap sheet produced by Lamar in discovery also appears to demonstrate Mr. Hughes's knowledge of the policy. (Doc. 25-1 at 14–15.)

> In the case of unilateral contracts for employment, where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation. In this manner, an original employment contract may be modified or replaced by a subsequent unilateral contract. The employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employee supplies the necessary consideration for the offer.

*Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725, 731 (Ala. 1987).

Third, Lamar describes and quotes at length *Summers v. Ralston Purina Co.*, 260 Ala. 166, 171 (1954). *Summers* featured a dispute between an at-will plaintiff employee and his employer about the terms of a written employment contract. The Alabama Supreme Court found that, pursuant to the terms of the written employment contract, the employee was entitled to a bonus. But the court also found that when the employee and his manager discussed the bonus sometime after the parties signed the contract, the manager told the employee that he was not eligible for the bonus. The Court determined that the conversation obviated the employer's obligation to pay the bonus, and that by continuing to work after the conversation, the employee accepted a new contract with new terms. Even though the employee disagreed with the manager during the conversation, the Court explained that

> the prior agreement to pay [the employee] a bonus . . . was eradicated, and an offer was made on the part of [the manager] to give [the employee] employment thereafter on the basis outlined by [the manager]. [The employee], by continuing to work, accepted [the manager's] offer. From that date forward, a new and different contract, terminable at will, existed. Obligations under the prior agreement, also terminable at will, had been extinguished. . . . If [the employee] did not like the terms imposed by the employer, he had the election to quit or not to quit. He could either accept the terms imposed or resign. . . . The only reasonable conclusion fairly to be drawn from the fact that [the employee] continued to work is that reluctantly he decided it was better to "take it" than to "leave it."

*Id.* at 171.

Lamar concedes that the July 2010 Compensation Plan—the first written contract

8

between the parties—did not mention the practice. But when Mr. Hughes "learned Lamar would pay him commissions only when the customer paid within 90 days, Plaintiff had the option to accept those terms or to resign. Plaintiff chose to accept those terms and continued working for Lamar under the terms offered to him. . . . Plaintiff cannot recover from Lamar for paying him in accordance with the terms that were previously agreed upon." (Doc. 9 at 16.)

In response, Mr. Hughes argues that he never agreed to the practice. "While Mr. Hughes became aware that he would not be paid for invoices outstanding beyond 90 days, he never explicitly or implicitly agreed to waive the right to be paid for such, and did not impliedly agree to waive commissions for accounts that were not paid within 90 days. He never consented in [any] way, shape, or form to such a practice." (Doc. 15 at 6.) Mr. Hughes argues that he never consented to the practice because the instant "case differs from *Summers* . . . in a critical detail. In *Summers*, the new contract terms were *explicitly communicated* to the employee. He would not receive the bonus. The new contract between the parties formed thereafter did not contain the bonus provision. In this case, Mr. Hughes specifically states that he *never agreed* to any term limiting commissions to those accounts paid within ninety (90) days." (Doc. 15 at 8, emphasis added.)

The court finds Mr. Hughes's argument unpersuasive for two reasons. First, Mr. Hughes appears to improperly conflate an employer's communication of new contractual terms with the employee's acceptance of those terms. The Court in *Summers* opined that an at-will employee's *knowledge* of new terms, not the communication of the new terms, was the dispositive issue. *See Summers*, 260 Ala. at 171 ("We think it clear enough that after that conversation, [the employee] *knew* the exact attitude of [the employer] concerning a bonus") (emphasis added.)

Second, Mr. Hughes appears to argue that because he verbally disagreed with the practice sometime after he learned about it, then he did not consent to the practice. But the employee in *Summers* also "argue[d] that he dissented to any change in the terms of the original agreement. [The employee's] argument, however, is unavailing." *Id.* Although Mr. Hughes does not specify how or when he came to know about the practice, he does not contest the essential fact that he in fact knew about it. *See* Doc 8-1 at 38–62 (showing that Mr. Hughes knew about the practice by January 2013 at the latest). Mr. Hughes argues that he "never in any fashion whatsoever consented to this practice, or told Lamar that [he] agreed to it." (Doc. 15 at 12.) But under *Summers*, an at-will employee's decision to continue working pursuant to an understanding of changed terms constitutes the acceptance of an offer on a new contract, such that the only relevant questions are whether the at-will employee (a) knew about the changed terms and (b) continued to work.

Because Mr. Hughes concedes both questions, the court finds, as a matter of law, that Mr. Hughes's knowledge of the practice constituted an offer for a new contract that Mr. Hughes accepted by continuing to work for Lamar.

Alternatively, Mr. Hughes contends that even if his continued work for Lamar constituted acceptance of a new contract, the new contractual terms did not include the practice, because between 2012 and 2014, the parties signed monthly recap sheets that included references to Mr. Hughes's original, written employment contract from 2010. (Doc. 25 at 3.) Mr. Hughes argues as a general matter of law that whenever a written contract exists, the parol evidence rule precludes all extra-textual terms from the agreement. (Doc. 25 at 9.) Applying this legal proposition to the instant case, Mr. Hughes argues in the alternative that because the parties executed monthly,

10

*written* recap sheets, the *non-written* practice was never a contractual term. For this reason, Mr. Hughes concludes, Lamar breached a new, written contract every single month. (Doc. 25 at 8–10.) The court finds Mr. Hughes's alternative argument unpersuasive.

The court agrees with Mr. Hughes that rather than a one-time modification of the 2010 contract, the parties appear to have reached a series of completely new agreements. *See Summers*, 260 Ala. at 172 ("[I]t is stated that there is embraced within [the power to terminate a contract] the right of the employer to modify the contract as a condition of continued employment. Strictly speaking, however, a *modification at the insistence of one party does not occur*; instead, the birth of a new and different contract arises, upon the termination of its predecessor") (emphasis added.) Mr. Hughes presents evidence to show that each month, he signed a recap sheet that incorporated by reference the original employment contract, signed by both parties in July of 2010.

For example, in the February 2012 recap sheet, which itemizes Mr. Hughes's monthly earnings for various types of advertising space, the signatures of both Mr. Hughes and his manager, Tom Traylor, appear next to the text "BRYAN HUGHES – Effective July 1, 2010." (Doc. 25-1 at 14–15.) This "Effective July 1, 2010" references Mr. Hughes's original, written employment contract, also signed by both Mr. Hughes and Mr. Traylor. The court agrees with Mr. Hughes that these references to the July 2010 contract appear to constitute an incorporation by reference, such that the recap sheets and the July 2010 contract may be read together. *See McDougle v. Silvernell*, 738 So. 2d 806, 808 (Ala. 1999) ("Other writings, or matters contained therein, which are referred to in a written contract may be regarded as incorporated by the reference as a part of the contract and[,] therefore, may properly be considered in the

construction of the contract.")

But the court rejects Mr. Hughes's argument that because each month's *written* recap sheet incorporated by reference the original *written* compensation plan, the parol evidence rule should prevent Lamar from referring to Mr. Hughes's knowledge of the practice as a term of the agreement(s). (Doc. 25 at 4–5.) To support his position, Mr. Hughes cites to *Borden v. Case* for the proposition that "the written evidence of the terms of the agreement need not all be expressed in one paper. If expressed in two or more papers, it will be sufficient, if collectively they contain enough, and refer to each other, and show the connection with sufficient clearness, *without the aid of oral testimony*." *Borden v. Case*, 270 Ala. 293, 297 (1960) (emphasis added).

In arguing that the parol evidence rule categorically bars consideration of extrinsic evidence regarding the parties' intentions whenever at least *something* is written down, Mr. Hughes ignores a significant body of contrary case law. Even overlooking the fact that the Alabama Supreme Court drafted the above excerpt from *Borden* specifically within the context of real estate transactions, Lamar correctly points out that the parol evidence rule only applies when a written contract is both fully integrated and unambiguous.

As the Alabama Supreme Court explained,

> The parol evidence rule . . . does not apply to every contract of which there exists written evidence, but applies only when the parties to an agreement reduce it to writing, and agree or intend that the writing shall be their complete agreement. It is often stated that parol evidence is not admissible to vary or contradict the terms of a written contract; however, this abbreviated statement of the rule is misleading because it begs the critical question whether the writing is, in fact, a true and final expression of the agreement made by the parties. . . . Where there exists doubt that the written agreement was ever intended to reflect the full agreement of the parties, the courts of this State have not hesitated to admit contradictory parol evidence of their true agreement.

*Hibbett Sporting Goods, Inc. v. Biernbaum*, 375 So. 2d 431, 434 (Ala. 1979). *See also Rime-*

*Shatten Dev. Co. v. Birmingham Cable Commc'ns, Inc.*, 569 So. 2d 332, 334 (Ala. 1990) (explaining that the parol evidence rule permits "the introduction of extrinsic evidence in the event of fraud, mistake, or ambiguity.")

Here, Mr. Hughes has presented no evidence to suggest that the monthly recap sheets, which incorporate by reference the original compensation plan, constitute an integrated, "true and final expression of agreement." *Id*. Conversely, Lamar has presented evidence to show that the "2010 Compensation Plan does not have all the employment terms and is not a complete contract. For example, it does not provide any time-frame and it does not mention the Special Incentive Bonuses, the at-will nature of Plaintiff's employment, employee benefits, and the practice of not paying Account Executives commissions paid if customer payments are aged over 90 days." (Doc. 19 at 6.)

The court agrees with Lamar that the "true agreement" of the parties included the practice, and that every month, Mr. Hughes accepted a new contract that contained the practice as one of its terms. *See Hibbett Sporting Goods, Inc.*, 375 So. 2d at 434. Although Mr. Hughes strenuously attempts to differentiate the instant case from *Summers*, the only distinctions are superficial; in *Summers,* the employee accepted an unwritten term within a new, unwritten contract by continuing to work for the company following his knowledge of the changed terms; in this case, Mr. Hughes accepted the unwritten terms within a series of new, partially written contracts by continuing to work for the company following his knowledge of the changed terms. But this discrepancy is immaterial. *See Lawler Mobile Homes, Inc. v. Tarver*, 492 So. 2d 297, 304 (Ala. 1986) ("[A] contract may consist of several communications between the parties, some in writing and some oral, each constituting a link in the chain which comprises the entire

13

contract.")

Because Mr. Hughes was aware of the practice by early 2013 at the latest but continued to work for Lamar until June 2017, "the only reasonable conclusion fairly to be drawn from the fact that [he] continued to work is that reluctantly he decided it was better to 'take it' than to 'leave it.'" *See Summers*, 260 Ala. At 171. And because the Complaint alleges damages "between 2013 and 2017" (Doc. 1 at 5) and Mr. Hughes continually accepted Lamar's employment offers during this same period, Mr. Hughes's breach of contract claim fails as a matter of law. Similarly, because the parties acted pursuant to a non-breached contract, Mr. Hughes's alternative count of unjust enrichment also fails. *See Blackmon v. Renasant Bank*, 232 So. 3d 224, 228 n.4 (Ala. 2017) ("[U]njust enrichment has no application in a situation where there is an explicit contract which has been performed") (citation omitted).

**Conclusion**

Because Mr. Hughes accepted the altered terms of employment by continuing to work with Lamar after knowledge of the practice, no genuine issues of material fact exist, and Lamar is entitled to summary judgment. Mr. Hughes's attempt to certify a nationwide class is also moot. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1297 (11th Cir. 2005) (finding that because "summary judgment was properly granted as to the underlying claims of the class representatives, the issue of class certification is moot.") The court **WILL GRANT** Lamar's motion for summary judgment (Doc. 8) and enter a separate order accompanying this memorandum opinion.

**DONE** and **ORDERED** this 24th day of June, 2020.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE